1681CV00662


Superconducting Systems, Inc


v.


Ionetix Corp


# REMOVAL TO US DISTRICT COURT OF MASSACHUSETTS

*3*

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SUPERCONDUCTING SYSTEMS, INC., | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| IONETIX CORPORATION, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

Civil Action No. 16-10542

I hereby certify on _____ that the
foregoing document is true and correct copy of the
☐ electronic docket in the captioned case
☑ electronically filed original filed on _____
☐ original filed in my office on _____
Robert M. Farrell
Clerk, U.S. District Court
District of Massachusetts
By: _____
Deputy Clerk

FILED
IN THE OFFICE OF THE
CLERK OF COURTS
FOR THE COUNTY OF MIDDLESEX
MAR 2 1 2016
_____
CLERK

## NOTICE OF REMOVAL

TO:    THE CHIEF JUDGE AND JUDGES OF THE UNITED STATES DISTRICT COURT
       FOR THE DISTRICT OF MASSACHUSETTS

The Defendant, Ionetix Corporation, a Delaware Corporation with its principle place of business in San Francisco, California, files this Notice of Removal of the above-captioned action from Middlesex County Superior Court, Commonwealth of Massachusetts, Case No. 1681CV00662, pursuant to 28 U.S.C. §§ 1332, 1441 and 1446, to the United States District Court for the District of Massachusetts. In support of its Notice of Removal, Ionetix states as follows:

1.    According to the docket, on or about March 8, 2016, the Plaintiff, Superconducting Systems, Inc. filed a Complaint in the Middlesex County Superior Court. See Complaint (attached hereto as Exhibit A) and Middlesex County Public Docket Report (attached hereto as Exhibit B).

2.    The Complaint and Summons were received by Ionetix's CEO via e-mail on March 14, 2016. Accordingly, this Notice of Removal, which must be filed no later than 30 days after

receipt, through service or otherwise, of the Summons and Complaint, is timely filed pursuant to 28 U.S.C. § 1446(b). A copy of all process, pleadings, and orders from the Superior Court are attached hereto as Exhibits A and B.

3.     The gravamen of Plaintiff's complaint is a breach of contract claim. Plaintiff alleges that it designed, manufactured, shipped, and supervised installation of a successful superconducting magnet. See Compl. ¶¶ 52-59. Plaintiff further alleges that Ionetix failed to make the second payment installment for the magnet, which was due after receipt and determination that the magnet was successful (the "Success Payment"). See id. ¶¶ 52-56, 63. Plaintiff also alleges that Ionetix failed to adhere to the exclusivity requirement and thus is subject to a fee that the parties pre-determined in the case of failure to reach an agreement for future magnet purchases. See id. ¶¶ 30-31, 64-65.

4.     Plaintiff claims that it is owed a "Success Payment" in the amount of $74,000 and a fee in the amount of $100,000 for Ionetix's breach of the exclusivity agreement. See Compl. ¶¶ 55-65; Counts I-II. In addition, Plaintiff claims unspecified amounts in damages under theories of fraud (Count III), negligent misrepresentation (Count IV), promissory estoppel/detrimental reliance (Count V), theft or misappropriation of trade secrets (Count VI), violation of Massachusetts General Laws Ch. 93 §§ 42, 42A (Count VII), and violation of G.L. c. 93A (Count VIII). Plaintiff's alleged damages support an inference that the amount in controversy exceeds $75,000. See Compl. ¶¶ 68-115; see also State Court Civil Cover Sheet (attached hereto as Exhibit B).

5.     As pled in the Complaint, Plaintiff, Superconducting Systems, Inc., is a Massachusetts corporation with a principle place of business located at 900 Middlesex Turnpike, Building #5. Suite 1C, Billerica, Middlesex County, Massachusetts. Compl. ¶ 1.

2

6.      As pled in the Complaint, Defendant, Ionetix Corporation, is a Delaware Corporation

with its primary place of business located at One Ferry Building, Suite 225, San Francisco,

California. Compl. ¶ 2.

7.      Federal jurisdiction exists pursuant to 28 U.S.C. § 1332 because there is complete

diversity of citizenship between the Plaintiff and Defendant, and the amount in controversy,

exclusive of interest and costs, exceeds $75,000. The action is removed pursuant to 28 U.S.C §

1441(b) because Defendant is not a citizen of Massachusetts.

8.      Pursuant to 28 U.S.C. § 1446(a), this Notice of Removal is filed in the United States

District Court for the District of Massachusetts, which is the District Court in which the state

court action is pending.

9.      A stamped copy of this Notice of Removal will be filed with the Middlesex County

Superior Court, Commonwealth of Massachusetts, and served on counsel of record for the

Plaintiff pursuant to 28 U.S.C. § 1446(d).

        WHEREFORE, the Defendant, Ionetix Corporation, respectfully requests the removal of

the above-captioned matter from Middlesex County Superior Court to the United States District

Court for the District of Massachusetts.

        DATED:      March 17, 2016

                                                Respectfully submitted,

                                                IONETIX CORPORATION

                                                By their attorneys,

                                                /s/ Jack W. Pirozzolo
                                                Jack W. Pirozzolo (BBO# 564879)
                                                SIDLEY AUSTIN LLP
                                                60 State Street, 36th Floor
                                                Boston, Massachusetts 02109
                                                Telephone:  (617) 223-0304
                                                Facsimile:  (617) 223-0301
                                                jpirozzolo@sidley.com

                                       3

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2016, a true and correct copy of the foregoing document was served on counsel of record via the Court's CM/ECF system and served by mail to all parties unable to accept electronic service.

/s/ *Jack W. Pirozzolo*
Jack W. Pirozzolo

4

## COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS.

|  |  |
|---|---|
| ) | SUPERIOR COURT DEPARTMENT |
| ) | CIVIL ACTION NO. 16-0662 |

SUPERCONDUCTING
SYSTEMS, INC.,

                  Plaintiff,

        v.

IONETIX CORPORATION,

                  Defendant.

### NOTICE OF REMOVAL

TO:   Clerk of Court
      Middlesex County Superior Court
      200 Trade Center
      Woburn, MA 01801

      Christopher J. Marino
      DAVIS, MALM & D'AGOSTINE, P.C.
      One Boston Place
      Boston, MA 02108



**PLEASE TAKE NOTICE** that in the above-entitled action Defendant Ionetix

Corporation has filed a Notice of Removal, a copy of which is attached hereto as <u>Exhibit 1</u>, in the

office of the Clerk of the United States District Court for the District of Massachusetts, pursuant

to 28 U.S.C. § 1332, containing a statement of facts which entitles it to removal.

     You are also advised that pursuant to 28 U.S.C. § 1446(d), the Middlesex Superior Court

shall proceed no further in this action unless and until the action is remanded.

DATED:       March 18, 2016

Respectfully submitted,

IONETIX CORPORATION

By their attorneys,

Jack W. Pirozzolo (BBO# 564879)
SIDLEY AUSTIN LLP
60 State Street, 36th Floor
Boston, Massachusetts  02109
Telephone:  (617) 223-0304
Facsimile:  (617) 223-0301
jpirozzolo@sidley.com


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served upon the following attorney of record by first class mail on March 18, 2016.

Christopher J. Marino
DAVIS, MALM & D'AGOSTINE, P.C.
One Boston Place
Boston, MA 02108

Jack W. Pirozzolo

2

| CIVIL TRACKING ORDER (STANDING ORDER 1- 88) | DOCKET NUMBER 1681CV00662 | Trial Court of Massachusetts The Superior Court |
|---|---|---|

| CASE NAME: Superconducting Systems,Inc. vs. Ionetix Corporation | Michael A. Sullivan, Clerk of Court Middlesex County |
|---|---|

| TO: File Copy , | COURT NAME & ADDRESS Middlesex Superior - Lowell 360 Gorham Street Lowell, MA 01852 |
|---|---|

### TRACKING ORDER - F - Fast Track

You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated.

### STAGES OF LITIGATION                                    DEADLINE

|  | SERVED BY | FILED BY | HEARD BY |
|---|---|---|---|
| Service of process made and return filed with the Court |  | 06/06/2016 |  |
| Response to the complaint filed (also see MRCP 12) |  | 07/06/2016 |  |
| All motions under MRCP 12, 19, and 20 | 07/06/2016 | 08/05/2016 | 09/06/2016 |
| All motions under MRCP 15 | 07/06/2016 | 08/05/2016 | 09/06/2016 |
| All discovery requests **and depositions** served and non-expert despositions completed | 01/02/2017 |  |  |
| All motions under MRCP 56 | 02/01/2017 | 03/03/2017 |  |
| Final pre-trial conference held and/or firm trial date set |  |  | 07/03/2017 |
| Case shall be resolved and judgment shall issue by |  |  | 03/08/2018 |

The final pre-trial deadline is **not the scheduled date of the conference**. You will be notified of that date at a later time.

**Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.**

This case is assigned to

| DATE ISSUED 03/08/2016 | ASSISTANT CLERK Michael M Brennan | PHONE (978)453-0201 |
|---|---|---|

Date/Time Printed: 03-08-2016 10:17:26                                    SCV026\ 11/2014

| CIVIL ACTION COVER SHEET | DOCKET NUMBER 16-0662 | Trial Court of Massachusetts The Superior Court |
|---|---|---|

**PLAINTIFF(S):** Superconducting Systems, Inc.

**ADDRESS:** 900 Middlesex Turnpike, Bldg # 5, Suite 1C

Billerica, Massachusetts 01821

**COUNTY** Middlesex

**DEFENDANT(S):** Ionetix Corporation

**ATTORNEY:** Christopher J. Marino

**ADDRESS:** Davis Malm & D'Agostine, P.C.

One Boston Place, 37th Floor

Boston, MA 02108

**BBO:** 655007

**ADDRESS:** One Ferry Building, Suite 225

San Francisco, CA 94111

### TYPE OF ACTION AND TRACK DESIGNATION (see reverse side)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| A01 | Goods Sold & Delivered | F | [X] YES   [ ] NO |

**\*If "Other" please describe:**

### STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

#### TORT CLAIMS
(attach additional sheets as necessary)

A. Documented medical expenses to date:
1. Total hospital expenses .................................................
2. Total doctor expenses ................................................. $
3. Total chiropractic expenses ........................................... $
4. Total physical therapy expenses ....................................... $
5. Total other expenses (describe below) ................................. $
   Subtotal (A): $

B. Documented lost wages and compensation to date ........................ $
C. Documented property damages to dated ................................. $
D. Reasonably anticipated future medical and hospital expenses ........... $
E. Reasonably anticipated lost wages .................................... $
F. Other documented items of damages (describe below) .................... $

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

TOTAL (A-F):$

#### CONTRACT CLAIMS
(attach additional sheets as necessary)

Provide a detailed description of claims(s):
Defendant has breached a contract failure to pay for the deliver of a supermagnet, failure to pay a termination fee, and failing to honor an exclusivity provision, among other things.

**TOTAL: $** < 175,000

**Signature of Attorney/Pro Se Plaintiff: X**     **Date:** 3/7/16

**RELATED ACTIONS:** Please provide the case number, case name, and county of any related actions pending in the Superior Court.

### CERTIFICATION PURSUANT TO SJC RULE 1:18

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

**Signature of Attorney of Record: X**     **Date:** 3/7/16

## COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS.

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO.

16-0662

| |
|---|
| SUPERCONDUCTING SYSTEMS, INC., |
| Plaintiff, |
| v. |
| IONETIX CORPORATION, |
| Defendant, |

FILED
IN THE
CLERK OF COURTS
FOR THE COUNTY OF MIDDLESEX
MAR 0 8 2016

CLERK

## COMPLAINT

This is an action brought by Superconducting Systems, Inc. against Ionetix Corporation seeking declaratory relief and asserting claims for breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, negligent misrepresentation, promissory estoppel, unjust enrichment, theft or misappropriation of trade secrets, and violations of G.L. c. 93 and 93A.

## PARTIES

1.     Plaintiff Superconducting Systems is a Massachusetts corporation established with its principal place of business located at 900 Middlesex Turnpike, Building #5, Suite 1C, Billerica, Middlesex County, Massachusetts.

2.     Defendant Ionetix Corporation is a Delaware Corporation with its primary place of business located at One Ferry Building, Suite 225, San Francisco, California.

## FACTUAL ALLEGATIONS

3.     Superconducting Systems is the owner of proprietary know-how and various patents (and has other applications pending), which allow it to engineer superconducting

magnets that are cryogen-free and which, as a result, are not only less expensive to manufacture and install, but are also more easily portable and adaptable to smaller applications.

4.      A superconducting magnet is an electromagnet comprised of coils of superconducting wire.  During operation, the magnet must be cooled and maintained to keep its superconductive state.  Magnetic resonance imaging, or MRI, is an everyday example of a superconductor magnet in operation.

5.      Generally, there are two types of cooling regimes used with magnet windings: liquid helium and conduction cooling.  Because liquid helium is expensive and it has been dwindling in recent and because these systems are more complicated to install and service and are less adaptable, many superconducting magnet producers have tried cryogen-free superconducting magnets in which the superconducting coils are cooled by conduction cooling.

6.      Superconducting Systems is one of the pioneers in cryogen-free design (i.e., conduction cooling) for superconducting magnets for MRI applications.  While it is not the only company in this market, Superconducting Systems possesses superior skill and acumen and various trade secrets and proprietary and confidential information which it regularly uses in design, development and manufacturing of its superconducting magnets.  Among other successes, Superconducting Systems was the first company to introduce a high field (magnetic field of 3T or higher) cryogen-free superconducting magnet to the pre-clinical MRI market.

7.      Superconducting Systems takes substantial and reasonable measures to safeguard and protect its confidential and proprietary information and trade secrets as well as the confidential and proprietary information and trade secrets of its customers.  Superconducting Systems' facilities and offices are located in a secure building, and its offices are locked and not accessible without permission.

2

8.      Access to Superconducting Systems' corporate network is granted only to authorized users, and access requires an authorized user login and password.  Privileges and access rights to the corporate network are granted on a user-by-user basis and are disabled once the network user account is disabled.

9.      Internally, certain highly confidential and proprietary information and trade secrets are kept in specific software and located on specific network directories which only select employees may access.

10.     Similarly, of the employees involved in the manufacturing and design process, employees' roles are segmented so that, while they may know how to do their job, they do not know how the entire magnet is designed or manufactured.

11.     Superconducting Systems also requires its employees to sign certain agreements as a condition of employment, including, confidentiality agreements.

12.     Superconducting Systems confidential and proprietary information and trade secrets, including its production methods, provide it with a competitive advantage over competing enterprises.

## The Founders of Superconducting Systems and Ionetix First Meet

13.     Superconducting Systems' President, Shahin Pourrahimi, was a research scientist at the Plasma Fusion and Science Center of Massachusetts Institute of Technology ("PFSC") from 1991 until 2000.  When he left PFSC, he formed Superconducting Solutions, but he continued to maintain close contact with PFSC.

14.     From 2000 until 2012, Timothy Antaya was also a research scientist at PFSC. While a senior scientist at PFSC in or about 2010, Antaya helped found Ionetix.  As a result of

Pourrahimi's continued involvement with PFSC, he and Antaya became professional and scientific collaborators.

15.     From his knowledge of Pourrahimi and his experience at MIT, Antaya knew that Superconducting Systems was making progress in the design and manufacture of conduction cooled superconducting magnets in the period between 2005 and 2010.

## Superconducting Systems Is Hired by Ionetix

16.     In or about 2010, Antaya created Ionetix to try to develop a particle accelerator system that used a cryogen-free superconducting magnet.  Upon information and belief, until he left the company, Antaya was Ionetix's President and Chief Technology Officer.

17.     Antaya hired third-party mechanical engineers to design his magnet system under his direction.  In summer of 2010 Antaya told Pourrahimi he would like Superconducting Systems to: (a) fabricate (wind) superconducting coils for his project, and (b) assemble and test his magnet, which at the time was named Isotron 12.5.  In August of 2010, Ionetix engaged Superconducting Systems to fabricate two sample coils for Antaya's Isotron 12.5.

18.     The relationship between Superconducting Systems and Ionetix was based on an oral agreement between Pourrahimi, on behalf of Superconducting Systems, and both Antaya and Kevin Cameron of Ionetix.  At all relevant times, Kevin Cameron was the Chief Executive Officer of Ionetix.

19.     Under the parties' oral agreement, Superconducting Systems would provide engineering services to manufacture certain magnet parts, assemble the magnets, and test the magnets.  Ionetix agreed to pay Superconducting Systems, on a bi-monthly basis, for its labor, material cost, and facility charges.

20.     During this initial period (while trying to construct the Isotron 12.5), Ionetix was responsible for the overall design, mechanical, cryogenic and electric aspects of the magnet and had its own engineering staff operating under Antaya's direction. Superconducting System was merely responsible for manufacturing and testing the magnet.

21.     During this manufacturer process, Superconducting Systems, while not required to do so, provided certain suggestions for to Ionetix and its design team. While some of the suggestions were accepted, others were not. Ultimately, manufacture and testing of the Isotron 12.5 ended in May 2011, when it was determined that the magnet would not cool as needed.

22.     In the summer of 2011, Ionetix needed help designing a working Isotron magnet. Superconducting Systems offered to, and agreed to, assist Ionetix and to take over the cryogenic design of the Isotron with the goal of making the magnet reach its target temperature. The magnetic design of the Isotron, i.e., the superconducting coils and iron pieces that provide the magnet field, would remain the same as under the Isotron 12.5 (Antaya's design). This new design was referred to as the Isotron II.

23.     Under the parties' continued oral agreement, Superconducting Systems would continue to charge Ionetix bi-monthly for the cost of its time and materials in manufacturing the Isotron II. Superconducting Systems still was not, however, making any profit under this agreement. Rather, Ionetix agreed that, if Superconducting Systems was able to design and manufacture an Isotron II, Superconducting Systems would be Ionetix's manufacturer of the Isotron II and that it would do so for a profit. This agreement was reached in, and confirmed in, several conversations that took place between Pourrahimi, on behalf of Superconducting Systems, and Cameron and Antaya, on behalf of Ionetix.

24.     Design of the Isotron II was completed by the end of 2011 and its assembly commenced in this summer of 2012.  In late 2012, the magnet was tested.  While the Isotron cooled to a temperature lower than projected, the Isotron still was not able to reach its target magnetic field.  In other words, while Superconducting Systems had delivered on its goal to deliver a magnet that sufficiently cooled, Antaya's design failed.

25.     When Antaya's design failed, Ionetix asked Superconducting Systems as an expert in superconducting magnet design to advise it as to what needed to occur to produce a viable superconducting magnet that would satisfy Ionetix's specification for its superconducting magnet.  In a memorandum dated January 31, 2013, Superconducting Systems described the potential reasons why the Isotron II-B did not function as needed by Ionetix and provided a list of recommendations that would allow the magnet to reach the specifications required by Ionetix.

26.     From Summer of 2010 until March 2013, Superconducting Systems charged Ionetix on a bi-monthly basis consistent with the parties agreement.  During this period, Ionetix paid the monthly invoices that it received from Superconducting Systems.

### The March 2013 Agreement

27.     Between January and March 2013, Superconducting Systems and Ionetix negotiated the terms under which Superconducting Systems would design, engineer and manufacturer a magnet that met Ionetix's specifications (the "March 2013 Agreement").  These discussions took place over a two or three week period, in San Francisco and Massachusetts, and the terms of the agreement were fully reached.

28.     Under the March 2013 Agreement, Superconducting Systems was required to design the magnet based on performance specifications provided by Ionetix.  In exchange for

Superconducting Systems' efforts and expertise in designing the magnet, Ionetix agreed to pay it $25,000.

29.     Under the terms of the parties March 2013 Agreement, if Superconducting Systems' design was found to be unacceptable, the parties would have no further obligation to one another.   If Superconducting Systems' design was acceptable (with or without some changes), then Superconducting Systems would manufacture one magnet for Ionetix.   In exchange for the one magnet, Ionetix agreed to pay Superconducting Systems $225,000 as follows: (a) $112,500 upon Ionetix's acceptance of the design, and (b) $112,500 upon acceptance of the first magnet.   While the purchase price of this one magnet was $225,000, $75,000 was to be credited as a deposit towards any future purchases made by Ionetix.

30.     Like it did under the original agreement, Superconducting Systems performed the work under the March 2013 agreement on a cost basis, in other words, without receiving any profit for its time and effort.   Rather, the reason Superconducting Systems was willing to help design and manufacture the magnet was so that it could be the exclusive manufacturer of the magnet.

31.     As a result, when negotiating the March 2013 Agreement, the parties specifically agreed that Superconducting Systems had the exclusive right to manufacture the first twenty (20) magnets purchased by Ionetix.   While Ionetix was not obligated to purchase any additional number of magnets from Superconducting Systems, if it purchased any such magnets it would do so through Superconducting Systems.

32.     The March 2013 Agreement is memorialized under the "Memorndum [sic] of Understanding,"("MOU") a copy of which is attached as Exhibit A.

33.     The MOU, drafted by Ionetix and its Chief Executive Officer – an attorney by training – provides both that it "is not and shall not be construed to be an offer or agreement of any kind," but then reverses course and says that it is a "binding MOU" subjecting the parties to "agree to negotiate in good faith a towards a definitive, written agreement (the "Definitive Agreement")." *See* Ex. A.  Ironically, however, the MOU was created after the parties had already reached a binding agreement – the March 2013 Agreement.

34.     After signing the MOU, both Ionetix and Superconducting Systems began performing their obligations under the March 2013 Agreement, as memorialized in the MOU. Tellingly, despite the fact that the MOU references the negotiation of a Definitive Agreement, the parties proceeded to perform their obligations without attempting to prepare such a Definitive Agreement.

35.     Among other steps of performance, Superconducting Systems designed the magnet for Ionetix and Ionetix paid Superconducting Systems the agreed upon $25,000.

36.     By the time Superconducting Systems submitted its magnet design to Ionetix, Antaya had left Ionetix and replaced by John Vincent, PhD, EE, who was Ionetix's Vice President of Engineering and New Product Development.   Because Vincent had different performance requirements than what Ionetix previously specified, Superconducting Systems agreed to redesign a magnet to meet the performance Vincent required.

37.     In or about September 2013, Vincent accepted the redesigned magnet, which the parties referred to as the Isotron III.

38.     As a result of the changes required by Vincent, Ionetix and Superconducting Systems agreed to modify the pricing they had previously agreed to under the March 2013 Agreement and the MOU.

39.     In a Purchase Order dated September 18, 2013, Ionetix agreed to purchase two magnets from Superconducting Systems for $330,000.  While two magnets under the March 2013 Agreement would cost Ionetix $280,000, under the parties oral modification to the March 2013 Agreement, Ionetix agreed to pay $330,000 and to purchase two magnets from Superconducting Systems. This was the only change made to the March 2013 Agreement.

40.     In the latter part of 2013, Vincent added certain unexpected and complex requirements to the Isotron III, which required the design to be changed to include new features. The design was finalized in or about December 2013.  At that time, Ionetix sent an engineer, Ken Stevens, a Massachusetts resident, to work out of Superconducting Systems facility in Massachusetts.  In addition to his general Ionetix responsibilities, Stevens was to observe Superconducting Systems' manufacturing the Isotron III.  Stevens was physically present, at Superconducting Systems' Massachusetts facility, on a daily basis from roughly December 2013 through October 2014 and again in 2015, whenever there was activity on the Isotron magnet project.

41.     While Stevens' role was to provide reports of the status of the Isotron III only, Stevens, upon information and belief, was using his limited access to obtain insight into, and information about, Superconducting Systems' confidential and proprietary information and trade secrets.  For example, Stevens was caught taking pictures of Superconducting Systems' confidential information and proprietary information and trade secrets being practices on other products.  Stevens was confronted and told not to do so, but, upon information and belief, continued to do so.  Were it not for the parties March 2013 Agreement and Ionetix's agreement to purchase additional magnets from Superconducting Systems, Stevens would not have been allowed in Superconducting Systems' facility.

42.     With approval from Ionetix, Superconducting Systems placed the orders for the component parts with a single, specific supplier.  While this supplier agreed to provide the materials to Superconducting Systems at the needed times, the supplier proved unable to do so.

43.     Superconducting Systems, aware that Ionetix was sensitive to time delay, continued to update Ionetix of the status of the project and the delays caused by the supplier. Ionetix was kept fully abreast of these delays because Stevens was present at Superconducting Systems and was present in the meetings with the supplier.  As a result, Ionetix was aware, based on the firsthand knowledge of its employee, that the delays were not caused by, the result of, or the fault of Superconducting Systems.

44.     When Superconducting Systems had still not received basic materials necessary to manufacturer the Isotron III by June 2014, Ionetix requested that Superconducting Systems not build the second Isotron III magnet.

45.     In or about September or October 2014, Superconducting Systems completed the magnet and delivered it to Ionetix.   When it delivered the Isotron III to Ionetix's Michigan facility, Superconducting Systems sent its engineer, Alexey Kaplan to supervise the installation and set-up of the magnet.

46.     While in Michigan, Kaplan overheard various Ionetix personnel discussing an ongoing project Ionetix had with Tesla – a competitor of Superconducting Systems.  As a result, Kaplan specifically asked Ionetix's engineer, Stevens, if they were having Tesla build them an Isotron magnet.  Stevens replied that Tesla was not working on an "Isotron."  Upon information and belief, Stevens' statements about Ionetix's relationship with Tesla was inaccurate when made.

47.     After being tested in Michigan, the Isotron III was determined to need additional work and was to be shipped back to Superconducting Systems for further testing and analysis. Despite the fact that the Isotron III needed additional work, Ionetix did not return it to Superconducting Systems until February 2015, several months later.

48.     When Pourrahimi learned that Ionetix was working with Tesla, he became concerned especially because he knew that Stevens had a prior relationship with Tesla.

49.     Consequently, when the Isotron III and Stevens finally returned to Massachusetts in February 2015, Pourrahimi told Stevens he understood Ionetix was working with Tesla. Stevens responded that Ionetix was not working with Tesla at all and that they were certainly not working with Tesla to build an Isotron (i.e., a magnet that would meet Vincent's specifications). Upon information and belief, Stevens' statements about Ionetix's relationship with Tesla was inaccurate when made.

50.     In February or March 2015, in a conversation with Carrie Busch, Ionetix's Vice President of Finance, Pourrahimi specifically asked her if Ionetix was having magnets build by other companies. Busch responded, in sum or substance, "No, we want to work with you. Upon information and belief, Busch's statements about Ionetix's relationship with Tesla and its desire to work with Superconducting Systems was inaccurate when made.

51.     During this February and March time frame, Stevens continued to report on a daily basis to Superconducting Systems' facility located in Massachusetts. The only reason Stevens was allowed to continue to be present and monitor Superconducting Systems' work was because Ionetix reaffirmed its commitment to purchase the additional twenty units from Superconducting Systems.

52.     By May 2015, Superconducting Systems had fixed the Isotron III, tested it, and was prepared to deliver it to Ionetix.  At the time, however, there were certain additional costs and amounts that Ionetix owed to Superconducting Systems to build the magnet.  Through a series of conversations and emails in May, Ionetix and Superconducting Systems agreed that Ionetix owed Superconducting Systems an additional $148,000.

53.     At the time, Ionetix and Superconducting Systems disagreed as to when and how these payments should be made.  To resolve their issue, on or about May 18, 2015, Superconducting Systems and Ionetix enter into a letter agreement (the "Letter Agreement").  A true and accurate copy of the Letter Agreement is attached as Exhibit B.

54.     The Letter Agreement provided that Superconducting Systems would ship the Isotron III, one magnet mapper and one Cyromech cryocooler to Ionetix.  In addition, Superconducting Systems was to supervise the installation of the Isotron III and provide the personnel to charge it.

55.     In exchange, Ionetix was to pay Superconducting Systems $74,000, when the Isotron III together with the mapper and the cryocooler were properly crated and prepared for shipment.  Ionetix was to make the second payment after it determined whether the Isotron III was "working successfully," which was defined by reference to certain performance requirements.  The Letter Agreement further provided:

> If the magnet is working successfully, Ionetix shall pay [Superconducting Systems] an additional sum of $74,000 (the "Success Payment") as soon as commercially practicable.  If the magnet is not working successfully, Ionetix shall return the magnet to [Superconducting Systems], who shall make best efforts to modify the magnet so it meets the criteria of success defined above as soon as commercially practicable.  If Ionetix does not consider the magnet successful, but does not return the magnet within four weeks of such determination, SSI shall be entitled to receive the Success Payment.

12

56.     On or about May 19, 2015, after signing the Letter Agreement, Superconducting Systems prepared the magnet, the magnet mapper and the Cryomech cryocooler to ship to Ionetix.  Having complied with the Letter Agreement, Ionetix paid Superconducting Systems the first $74,000.

57.     After shipping the Isotron III to Ionetix, Superconducting Systems traveled to Michigan and supervised the installation of the Isotron III and charged it.

58.     When Superconducting Systems finished its installing and charging the Isotron III, Ionetix began the process of verifying whether the magnet was working successfully.

59.     As a result of that process, the Isotron III met the criteria to be working successfully.  For example, on or about June 12, 2015, Vincent wrote that it had been "a very productive week" and that the "magnet has been to full field twice, adjusted and mapped three times."

60.     Despite the success of Superconducting Systems, the same month it learned that Tesla was building an Isotron III type magnet for Ionetix.

61.     In June 2015, Stevens showed up at Superconducting Systems' offices to remove his belongings.  During that meeting, Pourrahimi asked Stevens about the magnet being built by Tesla for Ionetix and Stevens, responded "When did you find out?"  When Pourrahimi asked Stevens when Tesla would be testing its magnet, Stevens said "In about two months."

62.     Upon information and belief, based on the time frame to design the Isotron III, Ionetix had been working with Tesla for at least the prior twelve months or since June 2014.  In other words, at the time the parties entered into the Letter Agreement and when Ionetix was repeatedly representing that it was not working with Tesla, Ionetix had already begun working with Tesla.

63.     To date, nine months later, Ionetix has neither returned the Isotron III nor paid the $74,000 due for keeping it.

64.     The Letter Agreement further provided that the parties try to negotiate in good faith a purchase agreement for future magnets and that, if such an agreement could not be reached, "Ionetix shall pay [Superconducting Systems] a fee of $100,000 in return for a release of all claims, either express or implied, against Ionetix or its employees."

65.     Despite the Letter Agreement, Ionetix did not even attempt to negotiate, in good faith, a purchase agreement for future magnets from Superconducting Systems. Ionetix has not paid the $100,000 fee it was to provide to Superconducting Systems.

66.     Not only does Ionetix continue to possess the Isotron III without paying for it, but the Isotron III is the machine that appears on the face of Ionetix's webpage. Ionetix continues to use Superconducting Systems' design, and its product, despite the fact that it has purchased at least one competing magnet from a competing manufacturer.

67.     On February 1, 2016, Superconducting System noticed an announcement on a LinkedIn page by Ionetix's Vice President, Sales and Business Development, touting the first installation of an Isotron particle accelerator that used a cryogen-free superconducting magnet by Tesla.

## COUNT I
## DECLARATORY JUDGMENT

68.     Superconducting Systems repeats and realleges each of the preceding allegations as if set forth herein.

69.     Superconducting Systems contends that the March 2013 Agreement and the Letter Agreement are valid and binding agreements between Superconducting Systems and Ionetix.

70.     Ionetix disputes that the March 2013 Agreement and the Letter Agreement are valid and binding agreements between Superconducting Systems and Ionetix.

71.     Superconducting Systems further contends that the time for Ionetix to determine whether the Isotron III was working successfully to pay the Success Payment, and to pay the $100,000 fee under the Letter Agreement have all passed.

72.     Ionetix disputes that the time for it to determine whether the Isotron III was working successfully to pay the Success Payment, and to pay the $100,000 fee under the Letter Agreement have all passed.

73.     An actual controversy has arisen between Superconducting Systems and Ionetix concerning the obligations of the parties under the March 2013 Agreement and the Letter Agreement, Superconducting Systems has an interest in these agreements, and the declaration sought here would terminate the controversy and remove the uncertainty over these agreements.

## COUNT II
## BREACH OF CONTRACT/BREACH OF IMPLIED COVENANT OF GOOD FAITH

74.     Superconducting Systems repeats and realleges each of the preceding allegations as if set forth herein.

75.     The March 2013 Agreement and Letter Agreement are valid and binding agreements between Superconducting Systems and Ionetix.

76.     Like all agreements, March 2013 Agreement and Letter Agreement have within them the implied covenant of good faith and fair dealing inherent in all contracts.

77.     Superconducting Systems performed all of its obligations under the March 2013 Agreement and Letter Agreement, including but not limited to, designing the magnets for Ionetix, manufacturing the magnets, shipping the magnets, and supervising the installation of the magnets.

78.     As more fully detailed above, Ionetix breached the March 2013 Agreement and

Letter Agreement as well as the implied covenant of good faith and fair dealing, by failing to

order additional magnets through Superconducting Systems and make the payments required by

these agreements.

79.     As a result of Ionetix's breach of the March 2013 Agreement and Letter

Agreement, Superconducting Systems has suffered and continues to suffer damages.

**COUNT III**
**FRAUD/DECEIT/FRAUDULENT INDUCEMENT**

80.     Superconducting Systems repeats and realleges each of the preceding allegations

as if set forth herein.

81.     Ionetix made intentional misrepresentations to Superconducting Systems as

described above.  Specifically, among other things, Stevens and Busch of Ionetix both told

Superconducting Systems: (a) that they were not working with Tesla or any other competitor on

an Isotron III magnet, and (b) that they wanted to continue to working with Superconducting

Systems.

82.     Ionetix knew that their statements were false and intended that Superconducting

Systems would rely on their misrepresentations.

83.     Superconducting Systems reasonably relied upon Ionetix's misrepresentations by,

among other things, continuing to work on the Isotron III, by continuing to allow Stevens access

to Superconducting Systems' facility, and by entering into the Letter Agreement.

84.     As a result of Ionetix's misrepresentations, Superconducting Systems has suffered

and continues to suffer damages.

## COUNT IV
## NEGLIGENT MISREPRESENTATION

85.     Superconducting Systems repeats and realleges each of the preceding allegations as if set forth herein.

86.     Ionetix made negligent misrepresentations to Superconducting Systems as described above.  Specifically, among other things, Stevens and Busch of Ionetix both told Superconducting Systems: (a) that they were not working with Tesla or any other competitor on an Isotron III magnet, and (b) that they wanted to continue to working with Superconducting Systems.

87.     In making the false statements, Ionetix failed to exercise reasonable care or competence in obtaining or communicating the information to Superconducting Systems.

88.     Ionetix intended, or was negligent in not expecting, that Superconducting Systems would rely on its misrepresentations.

89.     Superconducting Systems reasonably relied upon Ionetix's misrepresentations.

90.     As a result of Ionetix's misrepresentations, Superconducting Systems has suffered and continues to suffer damages.

## COUNT V
## PROMISSORY ESTOPPEL/DETRIMENTAL RELIANCE

91.     Superconducting Systems repeats, reiterates, and incorporates each of the preceding allegations as if set forth herein.

92.     In reliance on Ionetix's promises under the March 2013 Agreement and the Letter Agreement, Superconducting Systems designed, engineered, and deliver the Isotron III and did so on a cost-basis, i.e., without any profit.

93.     Ionetix's promise to pay Superconducting Systems and to purchase additional Isotron III magnets from Superconducting Systems, was intended to induce, and did induce, Superconducting Systems to design and manufacture the Isotron III.

94.     Superconducting Systems' reliance on Ionetix's promise to pay Superconducting Systems and to purchase additional magnets was reasonable under the circumstances.

95.     As a direct and proximate result of Ionetix's promise to pay Superconducting Systems and to purchase additional Isotron III magnets from Superconducting Systems, Superconducting Systems has been damaged in an amount to be determined at trial.

## COUNT VI
## THEFT OR MISAPPROPRIATION OF TRADE SECRETS

96.     Superconducting Systems repeats and realleges each of the preceding allegations as if set forth herein.

97.     Superconducting Systems' confidential and proprietary information and trade secrets include, without limitation, the design and manufacturer process and skills it employs to produce cryogen free superconducting magnets for MRI applications.

98.     Superconducting Systems took reasonable steps to preserve the secrecy of these trade secrets, including by limiting access to this information, segregating it on servers not accessible to all employees, and requiring key employees and contractors to sign a non-disclosure and confidentiality agreements.

99.     Ionetix, through Stevens, employed improper means to acquire and/or use Superconducting Systems trade secrets without Superconducting Systems' authorization.

100.    On information and belief, Ionetix is using, or has used, Superconducting Systems' trade secrets, confidential and proprietary information, and knowledge gained while Stevens was at Superconducting Systems' facility.

101.    As a result of Ionetix's wrongful actions, Superconducting Systems has suffered and continues to suffer damages and irreparable harm.

## COUNT VII
## VIOLATION OF MASSACHUSETTS GENERAL LAWS CH. 93 § 42, 42A

102.    Superconducting Systems repeats and realleges each of the preceding allegations as if set forth herein.

103.    Superconducting Systems' confidential and proprietary information and trade secrets include, without limitation, the design and manufacturer process and skills it employs to produce cryogen free superconducting magnets for MRI applications.

104.    Superconducting Systems took reasonable steps to preserve the secrecy of these trade secrets, including by limiting access to this information, segregating it on servers not accessible to all employees, and requiring key employees and contractors to sign a non-disclosure and confidentiality agreement.

105.    Ionetix employed improper means to acquire and/or use Superconducting Systems' trade secrets without its express authorization.

106.    On information and belief, Ionetix is using, or has used, Superconducting Systems' trade secrets, confidential and proprietary information, and knowledge gained while Stevens was at Superconducting Systems' facility.

107.    Ionetix's possession and/or use of Superconducting Systems' confidential and proprietary information and trade secrets will give it an unfair competitive advantage.

108.    Ionetix's knowing, willful and malicious conduct in misappropriating, disclosing, and using Superconducting Systems' information violates the Massachusetts Trade Secret Protection Act.

109.    As a result of Ionetix's wrongful actions, Superconducting Systems has suffered and continues to suffer damages and irreparable harm.

## COUNT VIII
## VIOLATION OF G.L. c. 93A

110.    Superconducting Systems repeats and realleges each of the preceding allegations as if set forth herein.

111.    Superconducting Systems is engaged in trade or commerce as defined in G.L. c. 93A.

112.    Ionetix is engaged in trade or commerce as defined by G.L. c. 93A.

113.    The acts and transactions constituting the unfair and deceptive acts and practices as alleged herein, including allowing Stevens to remain at Superconducting Systems' facility, Ionetix's theft or misappropriation of Superconducting Systems' confidential and proprietary information and trade secrets, and the breaches of the various agreements, as well as many of the fraudulent statements, occurred primarily and substantially within the Commonwealth.

114.    The use and employment of such unfair and deceptive acts and practices constituted knowing and willful violations of Chapter 93A by Ionetix.

115.    As a direct and proximate result of Ionetix's unfair and deceptive acts and practices, Superconducting Systems has suffered, and continues to suffer, damages.

**WHEREFORE**, Superconducting Systems respectfully requests that the Court order the following relief:

a.    enter judgment in its favor on Count I and declare: (a) the March 2013 Agreement and the Letter Agreement are valid and binding agreements between Superconducting Systems and Ionetix, and (b) the time for Ionetix to determine whether the Isotron III was working successfully, to pay the Success Payment, and to pay the $100,000 fee under the Letter Agreement have all passed.

b.    enter judgment in its favor on Count II through VI of its Complaint and order that Ionetix to pay damages in an amount to be determined at trial, together with interest and costs;

c.    enter judgment in its favor on Counts VII and VIII of its Complaint, and order that Ionetix pay damages in an amount to be determined at trial, plus costs, plus reasonable attorney's fees and treble damages;

d.    such further relief as the Court deems just.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

**SUPERCONDUCTING SYSTEMS, INC.**
By its attorneys,

Christopher J. Marino (BBO # 655007)
DAVIS, MALM & D'AGOSTINE, P.C.
One Boston Place
Boston, MA  02108
(617) 367-2500
cmarino@davismalm.com

Dated: March 7, 2016

768453.2

21

## MEMORNDUM OF UNDERSTANDING

This Memorandum of Understanding ("MOU"), effective as of March -__ , 2013 by and between Ionetix, Inc., a Delaware corporation, and Superconducting Systems Inc., a _____ corporation, is intended to memorialize the terms of a potential business relationship between the parties. This MOU is not and shall not be construed to be an offer or agreement of any kind. Pursuant to this binding MOU, the Parties agree to the following terms and agree to negotiate in good faith towards a definitive, written agreement (the "Definitive Agreement") that will set forth more definitive terms and conditions with respect to such relationship. This draft MOU and discussions relating thereto shall be treated by both parties as "confidential information," and each party agrees not to disclose such confidential information to third parties without the other party's prior written approval.

1. This agreement covers the supply and purchase of cryogen-free superconducting magnets similar to Isotron II in terms cryostat and cryogenic performance, but reaching a field of 5.5 T in their room temperature bore and meeting the magnetic field profile that will be specified by Ionetix, and accompanied by a 4K-1W cryocooler. Each magnet will be configured as a complete system such that Ionetix needs to do nothing other than plug it in, turn it on, etc.

2. SSI will be required to conduct the magnet system design as the first step in this agreement, based on the performance specifications provided to them by Ionetix. This shall require a $25,000 non-refundable deposit from Ionetix.

3. If the SSI design is found to be unacceptable, then Ionetix shall have the option of terminating this agreement and neither party shall owe the other anything further. If the SSI design is found to be acceptable (with or without some tweaks), then the agreement calls for SSI to proceed with the manufacture of one system for delivery to Ionetix. Ionetix for its part, will be required to make two payments to SSI, each of $112.5K. The first will be upon acceptance of the design and prior to commencement of manufacture of the first system. The second shall be upon acceptance of this first system. $75K of the second payment can be applied to the purchase by Ionetix of additional systems, should it choose to do so under the terms below. The next clause (exclusivity for the next 20 systems) shall not come into effect unless Ionetix accepts delivery of the first unit mentioned here.

4. In the event that Ionetix needs more magnets, it will buy the first 20 magnets that it purchases, after the 1 mentioned above, from SSI – in other words, it will not seek any other supplier than SSI for the first 20 magnets that it needs after the 1 mentioned above.

Such exclusivity shall be dependent on SSI manufacturing the first system of any lot order within 6 months of the down-payment set forth below and no more than 3 warranty claims per 50,000 hours of cumulative installed time of all systems installed during the period covered by this agreement, where it is determined that SSI or its subcontractors were primarily responsible for the issue that caused the warranty claim. The price of these additional magnets purchased from SSI shall be as follows:

    a. For any order that is placed for 3 magnets or less, $130K per magnet plus the cost of the cryocooler associated with each magnet.

    b. For any order that is placed for 4 or more magnets, $115K per magnet plus the cost of the cryocooler associated with each unit.

    c. All orders regardless of size, shall be accompanied by a down-payment of 50% of the expected invoice amount, with the $75K pre-payment above, counting toward this deposit if applicable.

5. In the event the magnet design desired by Ionetix changes after the first unit or at any point thereafter, the corresponding price charged by SSI may change. This change, if any, shall roughly scale with any changes in the cost of materials and parts in the new design, any changes in manufacturing effort and any changes in stored energy of the magnet. The prices mentioned above are firm for magnets for which orders are placed within three (3) years from the date of this agreement. If some of these magnet orders are placed past the 3-year mark, Ionetix is still obliged to obtain the 20 magnets from SSI as indicated above, but the price is subject to change on the same basis as the price changes due to changes in design as noted above.

6. In the event that Ionetix needs more than 21 magnets, SSI is willing to continue being a provider of magnets to Ionetix, but the price of these additional magnets shall be mutually agreed in advance between Ionetix and SSI.

7. If at any point the volume of magnets required by Ionetix is expected to exceed a rate of 12 a year or one a month, Ionetix will notify SSI at least 4 months in advance of the need for increased production rate.

8. Systems will be delivered by SSI with a 1-year warranty and SSI shall bring any system not meeting such warranty to a conformant condition at its sole and exclusive expense – whether it does so by replacing, onsite-repairing or offsite-repairing or some other method, is solely its decision. SSI shall also provide a certificate of compliance indicating that during factory testing, systems have reached a cold temperature of less than 5 K and have met the performance specifications provided by Ionetix.

9. In the post-warranty period for any system delivered by it, SSI will provide maintenance and support for such systems, as needed, on commercially reasonable time and material terms.

10. Ionetix shall pay SSI within 30 days of receipt of SSI's invoices for magnets delivered to Ionetix.

AGREED AND ACKNOWLEDGED:

Name: Kevin Comcron

Ionetix Corporation


_____

Name:

Superconducting Systems Inc.

**LETTER AGREEMENT**

Superconducting Systems Inc. ("SSI") and Ionetix Corporation ("Ionetix) hereby agree that SSI shall ship the Isotron III magnet currently located at SSI's facility in Billerica, MA to Ionetix's facility in Lansing Michigan, using an agreed-upon shipping service, on May 19, 2015. SSI shall also provide Ionetix with one magnet mapper as well as one Cryomech cryocooler, both of which are currently located at SSI's facility. Upon verification that the magnet has been properly crated and prepared for shipment, Ionetix shall wire $74,000 to SSI. Title to the Isotron III, the mapper and the cryocooler shall pass to Ionetix upon receipt of such funds by SSI.

Upon arrival in Michigan, SSI shall supervise installation of the magnet. As soon as practicable after the magnet has cooled down, SSI shall provide personnel to charge the magnet. Ionetix shall then verify whether the magnet is working successfully, with success defined as: (i) temperature sensors and other associated measurement and protective systems work properly and superconducting coils cool to less than or equal to 4.7K; (ii) magnet ramps to specified field and persists with an acceptable decay rate; and (iii) magnet can be aligned as verified by looking for harmonics via Fourier analysis of the magnet map. If the magnet is working successfully, Ionetix shall pay SSI an additional sum of $74,000 ("the Success Payment") as soon as commercially practicable. If the magnet is not working successfully, Ionetix shall return the magnet to SSI, who shall make best efforts to modify the magnet so it meets the criteria of success defined above as soon as commercially practicable. If Ionetix does not consider the magnet successful, but does not return the magnet within four weeks of such determination, SSI shall be entitled to receive the Success Payment.

The parties agree to negotiate in good faith a purchase agreement for future magnets, with agreed-upon pricing, delivery deadlines and associated penalties, and traditional and usual warranties of fitness and merchantability. If such an agreement cannot be reached, Ionetix shall pay SSI a fee of $100,000 in return for a release of all claims, either express or implied, against Ionetix or its employees.

AGREED TO AND ACCEPTED as of May 18, 2015:

Superconducting Systems Inc.

Shahin Pourrahimi,
President

Ionetix Corporation

Kevin Cameron



**COMMONWEALTH OF MASSACHUSETTS**
**MIDDLESEX COUNTY**
**Docket Report**

**1681CV00662**
**Superconducting Systems,Inc. vs. Ionetix Corporation**

| | | | |
|---|---|---|---|
| **CASE TYPE:** | Contract / Business Cases | **FILE DATE:** | 03/08/2016 |
| **ACTION CODE:** | A01 | **CASE TRACK:** | F - Fast Track |
| **DESCRIPTION:** | Services, Labor and Materials | | |
| **CASE DISPOSITION DATE** 03/21/2016 | | **CASE STATUS:** | Closed |
| **CASE DISPOSITION:** | Transferred to another Court | **STATUS DATE:** | 03/21/2016 |
| **CASE JUDGE:** | | **CASE SESSION:** | Civil L1 |

| LINKED CASE |
|---|

| PARTIES | | |
|---|---|---|
| **Plaintiff**<br>Superconducting Systems,Inc.<br>900 Middlesex Turnpike<br>Building #5 Suite 1C<br>Billerica, MA 01821 | **Attorney**<br>Christopher J. Marino<br>Davis Malm & D'Agostine, P.C.<br>Davis Malm & D'Agostine, P.C.<br>One Boston Place<br>Suite 3700<br>Boston, MA 02108<br>Work Phone (617) 367-2500<br>Added Date: 03/08/2016 | **655007** |
| **Defendant**<br>Ionetix Corporation<br>One Ferry Building<br>Suite 225<br>San Francisco, CA 94101 | **Private Counsel**<br>Jack Woodruff Pirozzolo<br>Sidley Austin LLP<br>Sidley Austin LLP<br>60 State Street<br>Boston, MA 02109<br>Work Phone (617) 223-0304<br>Added Date: 03/21/2016 | **564879** |

| EVENTS | | | | |
|---|---|---|---|---|
| Date | Session | Event | Result | Resulting Judge |
| | | | | |



| | | INFORMATIONAL DOCKET ENTRIES | | |
|---|---|---|---|---|
| **Date** | **Ref** | **Description** | | **Judge** |
| 03/21/2016 | | Case transferred to another court. | | |
| 03/21/2016 | | REMOVED to the U.S. District Court | | |
| 03/21/2016 | 3 | Notice of Removal to the United States District Court filed by | | |
| | | (Case 1:16-cv-10542-GAO) | | |
| | | Applies To: Ionetix Corporation (Defendant) | | |
| 03/21/2016 | | Appearance entered<br>On this date Jack Woodruff Pirozzolo, Esq. added as Private Counsel for Defendant Ionetix Corporation | | |
| 03/08/2016 | | Demand for jury trial entered. | | |
| 03/08/2016 | 2 | Civil action cover sheet filed. | | |
| 03/08/2016 | 1 | Original civil complaint filed. | | |
| 03/08/2016 | | Case assigned to:<br>DCM Track F - Fast Track was added on 03/08/2016 | | |
| 03/08/2016 | | Appearance entered<br>On this date Christopher J. Marino, Esq. added for Plaintiff Superconducting Systems,Inc. | | |

**MIDDLESEX, ss.**    *Commonwealth of Massachusetts*
SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT

In testimony that the foregoing is a true copy on file
and of record made by photographic process, I hereunto
set my hand and affix the seal of said Superior Court
this ___ day of march 2016
_____
Deputy Assistant Clerk